(No. 12247.—Decree affirmed.)

JOHN L. ALLISON, Appellee, *vs.* EMILY E. WHITE *et al.* Appellants.

*Opinion filed October 21, 1918—Rehearing denied Dec. 5, 1918.*

1. REAL PROPERTY—*life tenant cannot buy outstanding title and hold it for his exclusive benefit.* The life tenant cannot buy in an incumbrance or an outstanding title and hold it for his exclusive benefit against the estate in remainder, and if the life tenant is himself under obligation to pay the debt his purchase of the incumbrance will be treated in equity as a payment of the debt, and he will not be permitted to hold or enforce it against remainder-men.

2. SAME—*purchasers are chargeable with notice of facts in the records of their chain of title.* Purchasers of land are chargeable with notice of facts shown by the records in their chain of title, and if unusual facts appear, such as would cause a reasonably prudent person to suspect the title, they are chargeable with knowledge of whatever would be discovered by diligent inquiry.

3. SAME—*when life estate is primarily liable for satisfaction of mortgage.* Where it appears from a will that the life estate therein devised was not intended to come into possession until after the satisfaction of a mortgage, to which the rents were, if necessary, to be devoted, as between the life estate and the remainder the former is primarily liable for the satisfaction of the mortgage.

4. SAME—*when the disability of life tenant to purchase incumbrance continues after foreclosure and sale.* Where by the terms of a will the life estate devised is primarily liable for the payment of a mortgage on the land, the facts that the terms of the will are not carried out and that there is a foreclosure decree and sale thereunder do not relieve the life tenant of the disability to pur-

chase the incumbrance and enforce it for his own benefit against the remainder-men.

5. SAME—*effect where purchaser from life tenant also obtains master's deed.* Where the life estate is primarily liable for the payment of a mortgage but there is a decree of foreclosure and a sale thereunder, all the facts being a matter of record, a purchaser of the life estate who also purchases the certificate of purchase at the foreclosure sale and obtains a master's deed thereon cannot impose on the remainder-men a liability for the incumbrance. (*Galford* v. *Eastman,* 242 Ill. 41, distinguished.)

6. SAME—*a certificate of sale confers no title to the land.* A certificate of sale on foreclosure of a mortgage on land, for which the life estate therein devised by will is primarily liable, confers no title but only the right to obtain a title, and the life tenant still continues to be the owner of the life estate notwithstanding she fails to redeem from the foreclosure sale, and will become the absolute owner of such estate if a master's deed is not taken out within the time limited by the statute.

7. SAME—*when record of a deed is in chain of title.* Where a party purchases a life estate by warranty deed from the life tenant and also obtains a master's deed under a foreclosure decree and sale of the land, the record of the life tenant's deed is in the chain of title of a subsequent grantee even though the chain of title deducible through the foreclosure decree and sale is complete without considering the other channel.

8. SAME—*possession of life tenant or her grantee is not adverse to the remainder-men.* The possession of land by a tenant for life cannot be adverse to the remainder-men, and the possession by a grantee of the life estate, even under a deed purporting to convey the fee, cannot, during the lifetime of the life tenant, whose title was a matter of record, be adverse to the remainder-men so as to set the Statute of Limitations in operation. (*Lewis* v. *Pleasants,* 143 Ill. 271, and *Dugan* v. *Follett,* 100 id. 581, explained.)

9. SAME—*when remainder-men are not guilty of laches.* Where the records show that one in possession of land is a purchaser from a life tenant and has also obtained a master's deed under the foreclosure of a mortgage for which the life estate was primarily liable, the remainder-men are not required to take any action to protect their interests during the continuance of the life estate and are not guilty of *laches* in failing to do so.

APPEAL from the Circuit Court of Vermilion county; the Hon. WALTER BREWER, Judge, presiding.

LIVINGSTON J. CULLEN, WALTER T. GUNN, and REAR-
ICK & MEEKS, for appellants.

ISAAC A. LOVE, and ACTON & ACTON, for appellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

On April 26, 1917, the appellee, John L. Allison, filed
in the circuit court of Vermilion county a bill for the par-
tition of 320 acres of land of which he alleged that he and
his sisters, Clara Belle Haimbaugh and Laura Lamb Shan-
non, were tenants in common in fee simple. There was
no issue between the complainant and his sisters, but the
bill alleged that Emily E. White, through her tenant, Wil-
liam Irwin, was in possession of the land under an apparent
chain of title, which was set out, and had executed mort-
gages to Oren E. Taft, trustee, and to C. V. McClenathan,
trustee. All the persons named were made defendants to
the bill, which prayed, in addition to the partition, for the
quieting of the title and the cancellation of the mortgages.
Answers were filed, the cause was referred to a master, and
after a hearing upon exceptions to his report a decree was
rendered for the partition of the premises, adjudging the
title in fee simple to be in the complainant and his sisters,
and Emily E. White, Oren E. Taft, trustee, and C. V. Mc-
Clenathan, trustee, to have no right, title or interest in the
land. The last three named defendants have appealed.

There is no conflict of evidence as to the facts except
as to the execution by Laura Lamb Shannon of a convey-
ance of her interest in the premises, which does not affect
the main issue in the case. That issue depends entirely upon
the construction and effect of documentary evidence, unaf-
fected by oral testimony.

Thomas Armstrong was the owner of the land when he
died, on September 25, 1895. It was subject to a mortgage,
which included other real estate, which he had made to
the Northwestern Mutual Life Insurance Company on De-

cember 21, 1883, for $25,000. On June 24, 1894, he executed his will, which was admitted to probate after his death. The following sections of the will concern the present controversy:

"*Item 8*—I give and devise to my daughter Isabelle Allison, for and during the term of her natural life, the following described real estate lying and being in Vermilion county, Illinois, as follows, to-wit: The northwest quarter of section No. ten (10), township No. twenty-two (22), north, range No. twelve (12), west of the second principal meridian; also the southwest quarter of section No. three (3), township and range aforesaid. As a condition to the above devise I hereby require my said daughter Isabelle Allison to pay to my executor hereinafter named the sum of $1440, to be applied by my said executor toward the payment of my debts and the legacies herein provided for. Upon the death of the said Isabelle Allison the said lands hereinbefore given to her shall vest in the child or children of the said Isabelle Allison in fee simple. In case at the time of the death of the said Isabelle Allison any child or children born unto the said Isabelle should be also dead leaving issue surviving, such issue shall take the share in said lands which the deceased parent of such issue would have taken if living. If at the time of the death of the said Isabelle Allison she should leave no child or descendants or issue of such child surviving her, then said lands shall descend to and become vested in the brothers and sister of the said Isabelle in fee simple. In case either of said brothers or said brothers or said sister should also be dead but leaving issue surviving, such issue shall take the share in said lands the deceased parent would have taken if then alive, and the division of said lands among such issue shall be in conformity to the present Statute of Descent of the State of Illinois.

"*Item 9*—A part of the lands hereinbefore devised are incumbered by mortgage. I hereby direct my executor to

satisfy and discharge said mortgages out of my personal estate and out of the moneys which I have hereinbefore required my several devisees to pay to him, it being my intention to clear the title of all incumbrances created by me, so that all my devisees will have to pay will be the several amounts I have already named in this my last will.

"*Item 11*—I hereby direct my executor hereinafter named to convert all my personal property into money as soon after my decease as good business prudence will permit and pay the same upon my indebtedness as far as the same will extend or such indebtedness require. After my personal estate has been converted into money and applied upon my debts, and after the Armstrong real estate mentioned in item 3 hereof has been sold and the proceeds of sale applied upon my debts and the payment of legacies hereinbefore or hereinafter made, if any debts or legacies remain unpaid I direct that the same shall be paid out of the rents of my real estate as hereinafter set forth. I also direct that any crops growing upon my farm at the time of my death shall be taken as personal estate, and the same shall not vest in the devisees or devisee of such land.

"*Item 13*—I give and devise to my executor hereinafter named all the real estate of which I may die seized, in trust to rent the same upon reasonable rental for cash, and out of such rents pay, first, all taxes and assessments levied upon such real estate; and second, to pay for all necessary repairs on such real estate; and third, toward the payment of any of my debts, funeral expenses, cost of monument and legacies herein provided for and which may not be paid out of the proceeds of the sale of my personal estate. It is not my intention to hold said rental fund as a separate fund, not to be used except the personal property and the charges upon the real estate devised to my children shall be insufficient, but rather to enable my executor to more speedily pay my debts and legacies. It is not my wish to pay such legacies until after my debts are paid. In renting

said real estate preference is to be given to my several devisees, and in case the lands are rented to them the rent shall not exceed the sum of ...... dollars per acre. As soon as all my debts and legacies are paid, together with the funeral expenses, cost of monument and cost of administering my estate are paid, then my said executor shall surrender up possession of my said real estate to my devisees hereinbefore named. The legacies herein provided for shall not bear interest.

"*Item 14*—I give and bequeath all the rest, residue and remainder of my estate to my four children, Isabelle Allison, Thomas Jefferson Armstrong, James Lincoln Armstrong and Catherine Margaret Baker, share and share alike. In this item I include any sums remaining in the hands of my executor after the payment of the several sums herein provided for.

"*Item 18*—I give and devise to my son Thomas J. Armstrong a piece of ground four rods square out of the northeast corner of the southwest quarter of section No. three (3), township No. twenty-two (22), north, range No. twelve (12), west of the second principal meridian, (the same being a corner out of the lands hereinbefore given to my daughter Isabelle,) for the purpose of giving him a passway from one part of the lands given to him to the other lands given to him."

Thomas Armstrong left no widow, and his heirs were his four children, Isabelle Allison, Thomas J. Armstrong, James L. Armstrong and Catherine M. Baker. James L. Armstrong was appointed executor of the will, and on March 30, 1898, filed a final account in the county court, showing that he had received from each of the heirs and legatees the full amount due the estate,—the amount named in the will which each was to pay; that he had paid all debts, legacies and costs of administration; that the deficit needed to make such payments was paid to him by the heirs, and that the "amount received from Isabelle Allison on

deficit to settle estate" was $2668.61. The executor took
credit in the account for $20,807.50 paid the Northwest-
ern Mutual Life Insurance Company. The account was ap-
proved and the executor finally discharged. Nevertheless,
two days later, on April 1, 1898, the insurance company as-
signed its mortgage to E. R. E. Kimbrough, and on De-
cember 15, 1898, Kimbrough, as conservator of Charles L.
Draper, an insane person, filed a bill to foreclose the mort-
gage against Isabelle Allison, her husband, her three chil-
dren and the other heirs of Thomas Armstrong, alleging
that after the death of Thomas Armstrong his children
and devisees paid to the executor $17,807.50, and thereafter
there remained due and unpaid thereon $3000, which rep-
resented the amount Isabelle Allison was to pay, under the
terms of the will, for the purpose of paying the debts and
legacies of the testator. A guardian *ad litem* was ap-
pointed for Clara Belle Allison and John L. Allison, who
were minors. All the other defendants were defaulted, and
on February 14, 1900, a decree of foreclosure was entered
for $3326.50. There was a sale under the decree on March
19, 1900, to Kimbrough for the debt, interest and costs.

A warranty deed dated June 7, 1901, executed by Isa-
belle Allison and her husband, conveying the land to Wil-
liam B. Redden for a consideration of $20,000, was filed
for record on June 20, 1901, at 3:20 o'clock P. M. A
certificate of acknowledgment which was not dated was at-
tached to the deed, which contained the recital that the
grantors were to have the crop and pay the taxes of 1901.
On June 20, 1901, there was also filed for record at 3:50
o'clock A. M. a master's deed upon the decree in favor of
Kimbrough and the sale to him, reciting the assignment of
the certificate of sale to W. B. Redden and conveying the
land to him. Redden took possession of the land in March,
1902, and since that time he and his grantees have been
continuously in possession and have paid all the taxes. On
June 7, 1904, he conveyed the land to James E. White for

an expressed consideration of $35,000 but an actual consideration of $32,000. On November 12, 1904, James E. White conveyed the east half of the land to Jesse A. White, but Jesse conveyed it back on April 6, 1909. James E. White and wife mortgaged the land to Oren E. Taft, trustee, August 24, 1911, for $8000. On June 2, 1914, James E. White died intestate, and on June 5, 1914, his heirs conveyed all their interest in the land to his widow, Emily E. White. On March 1, 1915, she executed two separate mortgages, for $4000 each, to C. V. McClenathan,—one on the east half of the land, the other on the west half.

Isabelle Allison died on April 2, 1916, leaving the complainant and his two sisters, the only children she ever had. The complainant was born on July 5, 1890, Clara Belle Haimbaugh on February 25, 1889, and Laura Lamb Shannon, who was a daughter of Isabelle Allison by an earlier marriage, about 1880.

It is contended by the appellee in support of the decree that it was the duty of Isabelle Allison, the life tenant, under her father's will, through which she derived her title, to pay the mortgage debt, and that she could not purchase the incumbrance, or the title derived through it, and hold either to the detriment of the estate in remainder; that she could not convey a greater estate than she possessed, and that by her deed of June 7, 1901, Redden merely acquired her life estate, subject to the same obligations to which his grantor was subject; that the title of the appellants is the same as if Isabelle Allison had purchased the certificate of sale and obtained a master's deed to herself and had conveyed to them; that when Redden took the master's deed he held the life estate and therefore took the title for the remainder-men, and that the records were notice to his grantee of the infirmity of his title.

The law is well settled that the life tenant cannot buy in an incumbrance or an outstanding title and hold it for his exclusive benefit against the estate in remainder. If the

life tenant is himself under an obligation to pay the debt, his purchase of the incumbrance will be treated in equity as the payment of the debt, and he will not be permitted to hold or enforce it against the remainder-man. *Hanna* v. *Palmer,* 194 Ill. 41; *Blair* v. *Johnson,* 215 id. 552; *Galford* v. *Eastman,* 242 id. 41.

When James E. White acquired his title to the land to which the appellants have succeeded, the records were in existence which showed the facts which have been heretofore recited. The appellants were chargeable with notice of what appeared in the records, and if unusual facts appeared, such as would cause a reasonably prudent man to suspect the title, they are chargeable with knowledge of whatever would have been discoverd by diligent inquiry. (*Blake* v. *Blake,* 260 Ill. 70; *German-American Bank* v. *Martin,* 277 id. 629.) They are not, however, chargeable with notice of facts by records not in their chain of title. (*Rohde* v. *Rohn,* 232 Ill. 180; *Chicago and Eastern Illinois Railroad Co.* v. *Wright,* 153 id. 307.) The decree in the foreclosure suit was in their chain of title. The bill in that case recited Thomas Armstrong's will in full, and by it the appellants had notice of the character of Isabelle Allison's title. The will devised the land to her upon the express condition that she should pay to the executor $1440, to be applied toward the payment of the testator's debts and legacies. It referred to the fact that the lands were mortgaged and directed the executor to satisfy the mortgages out of the personal estate and the money required to be paid to him by the several devisees, declaring the testator's intention to clear the title of all incumbrances, so that all the devisees would have to pay would be the several amounts named in the will. If this had been all it could be said that the life estate was subject to a charge of $1440, only, but the testator, anticipating that his personal property together with the sums directed to be paid by his devisees might perhaps be insufficient for the payment

of his debts and the legacies mentioned in the will, devised all his real estate, by item 13 of his will, to his executor in trust, to rent the same, and out of the rents to pay, first, all taxes and assessments; second, necessary repairs; and third, the testator's debts and funeral expenses, the cost of a monument and the legacies in the will. As soon as the debts, funeral expenses, cost of the monument, legacies and cost of administration were paid, the executor was directed to surrender possession of the real estate to the devisees. It is thus seen that the life estate of Isabelle Allison was not intended to come into possession until after the satisfaction of the mortgage, to which the rents, if nec-, essary, were devoted. As between the life estate and the remainder the former was primarily liable for the satisfaction of the mortgage.

The method provided by the testator for the satisfaction of the mortgage was not binding on the mortgagor, and the decree of foreclosure is conclusive evidence that it was not carried out, and that at the date of the decree $3326.50, including solicitors' fees, remained due on the mortgage. The decree, and the sale under it, did not change the respective rights and obligations of the life tenant and the remainder-man. As between them, the incumbrance, though changed in form, still rested primarily upon the life estate, and the disability of the life tenant to purchase the incumbrance, for which his estate was primarily liable, and enforce it for his own benefit against the remainder-man, still continued.

It does not appear whether the life tenant purchased the incumbrance or the holder of the incumbrance purchased the estate for life. The deed to Redden is presumed to have been delivered on the day of its date. (*Lake Erie and Western Railroad Co.* v. *Whitham,* 155 Ill. 514.) The date of the assignment of the certificate of sale is not shown in the record. It may therefore have been before or after the deed. But this is not material. If after, then Redden was at the time the tenant for life, subject to the incumbrance,

and occupied the same position as his grantor, with the same disability to acquire the incumbrance and enforce it against the remainder. If before, then he afterwards became tenant for life, and his life estate was primarily liable for the incumbrance, which he himself owned, and since his own estate was primarily subject to the incumbrance he could not enforce it against the remainder, which as to him, the life tenant, was only secondarily liable. Prior to the execution of the master's deed Redden was the owner of the life estate, and the life estate was primarily liable for the incumbrance. Since his own estate was first liable for the debt he could not impose the liability for the incumbrance on the remainder merely because he was the owner of the incumbrance.

It is argued that Isabelle Allison could convey nothing by her deed but her right of redemption, which had already expired. Until the execution of the master's deed she was still the owner of the life estate, subject to the incumbrance of the sale. She was entitled to the possession and control of the property. The certificate of sale conferred no title to the land. It was only evidence of a right to obtain the title, and as against every right except that right, and until it was exercised and a deed made, Isabelle Allison was the owner of the life estate. By failing to redeem from the master's sale she did not lose her title, and if the master's deed was not executed within the time limited by the statute she was then the absolute owner of the life estate. *Lightcap* v. *Bradley*, 186 Ill. 510; *Schroeder* v. *Bozarth*, 224 id. 310.

It is insisted that the appellants are not bound by the record of Isabelle Allison's deed to Redden because it is not in their chain of title, which they deduce through the mortgage and the decree of foreclosure. It is true they show a complete chain of title without the deed from Isabelle Allison, but that deed is in their chain of title. She was the owner of the life estate at the time she executed

285 — 21

the deed. It was the first instrument through which Redden acquired any title to the land. He acquired title immediately through two channels though originally from the same source. Both channels were in his chain of title and his grantee was bound by the record of each of them. Subsequent purchasers of Redden's title had constructive notice that his acquisition of title under the foreclosure merely operated as a satisfaction of the mortgage. *McCall* v. *McCall,* 159 Mich. 144; *Vowen* v. *Brogan,* 119 id. 218; *Keller* v. *Fenske,* 123 Wis. 135.

The appellants rely upon the case of *Galford* v. *Eastman, supra,* from which they say this case cannot be distinguished. In that case the mortgage had been foreclosed, the land sold and fifteen months subsequent to the sale had expired. The life tenant, who was the father of the remainder-men, two of whom were minors, had been unable to redeem and was insolvent. The land was incumbered for its full value. The life tenant having arranged loans upon four separate mortgages, procured an assignment of the certificate of sale and a deed thereon to himself and executed mortgages for the full amount of the incumbrance. Three years later, being unable to pay the interest, he conveyed the land to a trustee, who sold the land in four different tracts for sums aggregating $100 more than the principal of the mortgages. The court recognized fully the principle that the life tenant could not so manipulate the title as to defeat the remainder and acquire the title for his own benefit, but held that he acted in the utmost good faith for the benefit of the remainder-men, to save the premises for them as well as himself, and that they lost nothing and were in no way injured by his acts. In this case there is no evidence that the life tenant was insolvent or unable to redeem. She was paid $20,000 for a conveyance of her life estate,—more than five times the amount of the incumbrance. The land was shown by the evidence to be worth $100 an acre, or $32,000, three years afterwards, and it was then apparent

that there had been no effort to protect the estate in remainder but that there was reason to suspect an effort to destroy it.

The answers of the appellants set up the defense of seven years' possession of the premises by actual residence thereon under a connected title deducible of record from the decree of foreclosure and the deed of the master in chancery, under section 4 of the Statute of Limitations, and also the defense of seven years' possession and payment of taxes, under section 6 of the statute. Adverse possession is a necessary element of these defenses, and the possession of the appellants during the life of Isabelle Allison was not adverse to the appellee. · The possession of land by a tenant for life cannot be adverse to the remainder-man or reversioner, and the possession of a grantee of the life estate, even under a deed purporting to convey the fee, cannot be adverse so as to set the Statute of Limitations in operation against the remainder-man or reversioner. (*Mettler* v. *Miller*, 129 Ill. 630; *Weigel* v. *Green*, 218 id. 227; *Schroeder* v. *Bozarth, supra; Cassem* v. *Prindle*, 258 Ill. 11.) The possession of the life tenant is consistent with and not adverse to the estate in remainder and in contemplation of law is the possession of the remainder-man, who has no right of entry and cannot bring an action for the possession until the termination of the life estate.

In *Lewis* v. *Pleasants*, 143 Ill. 271, and *Dugan* v. *Follett*, 100 id. 581, seven years' possession and payment of taxes under a warranty deed was held adverse to the remainder-man, but this decision was based entirely upon want of notice, either actual or constructive, of the life estate. In *Dugan* v. *Follett* the court says that it is a fundamental principle in the law of limitations that the statute never commences running until the right of entry accrues, and that the Statute of Limitations would have barred the action in that case if the deed creating the remainder had been recorded or if the defendants had purchased with notice of

it. The deed never having been recorded was held void as to subsequent purchasers without notice under section 30 of the Conveyance act, and it was therefore given no effect as to defendants, who purchased with no notice, actual or constructive, of the complainant's title.

The answers also relied upon *laches.* The sale under the decree of foreclosure was of the whole title which the mortgagor had at the date of the mortgage, and the effect of the master's deed was to transfer the entire legal title to Redden. Since he was the life tenant, equity regards his acquisition of the title through its sale for an incumbrance which was a primary charge on his life estate as a method of paying the debt. The record charged all subsequent purchasers with notice of this condition of his title. Since all the facts in connection with his title were of record there was no occasion for the appellee to take any action in regard to it and no *laches* in his failure to do so.

The answers averred that Laura Lamb Shannon had conveyed all her title and that it was now vested in Emily E. White. The evidence heard upon this question was contradictory, and we agree with the finding of the court that the execution of a deed was not shown.

Thomas Armstrong's will devised a piece of ground four rods square out of the northeast corner of this land to Thomas J. Armstrong for the purpose of giving him a passway from one part of the land given him to another. It is assigned for error that the appellee has shown no title to this parcel. This defense was not suggested in the answer, before the master or at the hearing, and it cannot be presented here for the first time.

The decree is affirmed.

*Decree affirmed.*